# EXHIBIT 2

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Eric R. Havian    (Bar # 102295)<br>Anne H. Hartman    (Bar # 184556)<br>Constantine Cannon LLP<br>4 Embarcadero Center, 14th Floor, San Francisco, CA 94111<br>TELEPHONE NO.: (415) 766-3507        FAX NO.: (650) 636-9709<br>ATTORNEY FOR *(Name):* Plaintiff-Intervenor City of Los Angeles | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 600 South Commonwealth Avenue
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 90005
BRANCH NAME: Central Civil West Courthouse

CASE NAME:
City of Los Angeles ex rel. Richard Knudsen v. Sprint Solutions, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited  [ ] Limited<br>(Amount          (Amount<br>demanded       demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | BC521193 (lead case); BC521566; BC521567<br>JUDGE: Lisa Hart Cole<br>DEPT 307 |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Mass tort (40) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Product liability (24) | **Real Property** | [ ] Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse<br>condemnation (14) | |
| [ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Business tort/unfair business practice (07) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Residential (32) | [X] Other complaint *(not specified above)* (42) |
| [ ] Fraud (16) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11) | |
| **Employment** | [ ] Writ of mandate (02) | |
| [ ] Wrongful termination (36) | [ ] Other judicial review (39) | |
| [ ] Other employment (15) | | |

**2.** This case [X] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the
factors requiring exceptional judicial management: Case has already been designated as complex while under seal.
  a. [ ] Large number of separately represented parties      d. [ ] Large number of witnesses
  b. [ ] Extensive motion practice raising difficult or novel   e. [X] Coordination with related actions pending in one or more courts
       issues that will be time-consuming to resolve           in other counties, states, or countries, or in a federal court
  c. [ ] Substantial amount of documentary evidence          f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
**4.** Number of causes of action *(specify):* FIVE (5)
**5.** This case [ ] is  [X] is not   a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 9, 2016
       Eric R. Havian                                        ▶ _(signature)_
       (TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed
  under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result
  in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all
  other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
  Page 1 of 2

**CM-010**

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SPRINT SOLUTIONS, INC., a Delaware corporation [Additional Parties listed on attached SUM-200(A) form];
Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
City of Los Angeles ex rel. Richard Knudsen

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES<br>Central Civil West Courthouse<br>600 South Commonwealth Avenue, Los Angeles, CA 90005 | CASE NUMBER:<br>*(Número del Caso):*<br>BC521193 (lead case); BC521566; BC521567 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Anne Hartman   (Bar # 184556)
Constantine Cannon LLP                                              Phone No.: (415) 766-3507
4 Embarcadero Center, 14th Floor, San Francisco, CA 94111

| DATE:<br>*(Fecha)* | Clerk, by<br>*(Secretario)* _____ | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* See attached SUM-200(A) form

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☒ other *(specify):* See attached SUM-200(A) form
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
*LexisNexis® Automated California Judicial Council Forms*

SUM-200(A)

| SHORT TITLE:<br>City of Los Angeles ex rel. Richard Knudsen v. Sprint Solutions, Inc. et al. | CASE NUMBER:<br>BC521193 (lead case); BC521566;<br>BC521567 |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

NEXTEL OF CALIFORNIA, INC., d/b/a SPRINT NEXTEL AND NEXTEL COMMUNICATIONS, a Delaware corporation; CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, a Delaware general partnership; NEW CINGULAR WIRELESS NATIONAL ACCOUNTS, LLC d/b/a CINGULAR WIRELESS n/k/a AT&T MOBILITY NATIONAL ACCOUNTS LLC, a Delaware limited liability company; and DOES 1-30

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

*LexisNexis® Automated California Judicial Council Forms*

1   CONSTANTINE CANNON LLP          NO FEE PER CAL. GOV'T CODE § 6103
    Eric R. Havian, CA Bar No. 102295
2       ehavian@constantinecannon.com
    Anne Hayes Hartman, CA Bar No. 184556
3       ahartman@constantinecannon.com
    Sarah Poppy Alexander, CA Bar No. 291080
4       spalexander@constantinecannon.com
    4 Embarcadero Center, 14th Floor
5   San Francisco, California 94111
    Telephone:    (415) 766-3507
6   Facsimile:    (650) 636-9709

7   Attorneys for Plaintiff City of Los Angeles

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **FOR THE COUNTY OF LOS ANGELES**

10  CITY OF LOS ANGELES *ex rel.* Richard        Case Nos. BC521193 (lead case);
    KNUDSEN                                       BC521566; BC521567
11
                        Plaintiffs,              **CONSOLIDATED COMPLAINT IN**
12                                               **INTERVENTION OF CITY OF LOS**
            vs.                                  **ANGELES**
13  SPRINT SOLUTIONS, INC; NEXTEL OF
    CALIFORNIA, INC., D/B/A NEXTEL
14  COMMUNICATIONS AND SPRINT NEXTEL;
    and, DOES 1-10,
15
                        Defendants.
16  CITY OF LOS ANGELES *ex rel.* Richard        BC521566
    KNUDSEN
17     .
                        Plaintiffs,
18
            vs.
19  CELLCO PARTNERSHIP D/B/A VERIZON
    WIRELESS; and, DOES 11-20,
20
                        Defendants.
21  CITY OF LOS ANGELES *ex rel.* Richard        BC521567
    KNUDSEN,
22
                        Plaintiffs,
23
            vs.
24  NEW CINGULAR WIRELESS NATIONAL
    ACCOUNTS, LLC D/B/A CINGULAR
25  WIRELESS, NOW KNOWN AS AT&T
    MOBILITY NATIONAL ACCOUNTS LLC; and,
26  DOES 21-30,

27                      Defendants.

28

                    **CONSOLIDATED COMPLAINT IN INTERVENTION**
                                                                        352217.4

The City of Los Angeles, having elected to intervene in this action, submits this Complaint in Intervention pursuant to Cal. Gov't Code § 12652(c)(8)(E).

## INTRODUCTION

1. Three of the nation's largest wireless Carriers have for years defrauded the City of Los Angeles out of the benefit of its bargain. The City contracted with AT&T, Sprint, and Verizon to provide wireless airtime, wireless data, and equipment. To win these contracts, the Carriers promised to provide the City with rate plan optimization, a cost-saving service that ensures that each wireless line is on the most cost-efficient rate plan based on that line's usage patterns. Rate plan optimization cuts deeply into the wireless Carriers' revenues and profits, as it saves customers from 20% to 30% on the cost of wireless services. The Carriers chose their profits over their express contractual commitments to optimize the City's lines and failed to provide this valuable service. The City intervenes in this lawsuit to return the Carriers' resulting overcharges to the City.

2. Optimization was so valuable to the City, provisions requiring it are found throughout the multi-tiered contractual relationship between the parties. The Carriers entered into special contracts with the City that, for much of the relevant time period, required the Carriers to "routinely identify" wireless lines not on the most optimized plan—thereby incurring excessive costs—and to work with the City "to place users in the most optimized plan." These Los Angeles-specific optimization requirements were in addition to optimization requirements fundamental to the underlying "form contracts" that formed the backbone of the City's relationship with the Carriers.

3. There were three such form contracts to which the City was a party. One was negotiated by the State of California and referred to as the State of California Wireless Contract ("CWC"), which was executed by Defendants SPRINT and VERIZON. The other contracts were negotiated by the State of Nevada and referred to as the Western States Contracting Alliance ("WSCA") contracts—the first in effect from 2006-2012, and the second in effect from 2012— which were executed by Defendants SPRINT, VERIZON, and AT&T. During the relevant time period, the City purchased wireless services under each of these contracts.

4. The CWC and WSCA contracts contained two interlocking provisions at issue in this case. The first provision—the rate plan optimization requirement—compelled the Carriers to

---

**CONSOLIDATED COMPLAINT IN INTERVENTION**

1   identify the *one* rate plan among the many offered for *each* wireless customer that would result in

2   the lowest cost to the City, and to do so every three months. The second provision—the "lowest cost

3   available" requirement—obligated the Carriers to ensure that government customers like the City

4   received wireless services at the lowest cost available, including by recommending optimized rate

5   plan assignments. Taken together, these two provisions, applicable during the entire relevant time

6   period, put on the Carriers the burden of providing the City with rate plan optimization reports that

7   would permit it to purchase wireless services at the lowest cost available each quarter. In sum, the

8   Carriers' obligation to provide rate plan optimization was replete throughout their agreements with

9   both the City individually and their more general contracts with government customers, including

10  the City.

11          5.      The Carriers agreed to the contractual provisions in the CWC and WSCA contracts to

12  gain access to the lucrative government market. The Carriers agreed to the individual provisions

13  relevant to the City for the same reason—Los Angeles is a multi-million dollar client. Once they

14  had secured the City's contract, however, the Carriers immediately breached these cost-saving

15  commitments. The Carriers knew that users cannot navigate among the bewildering array of rate

16  plans without optimization tools and consequently overspend. By purposefully not providing the

17  optimization tools that would allow the City to make an informed choice, the Carriers placed their

18  own profits above their contractual commitments to the government.

19          6.      The Carriers knew what they were doing. They knew the contracts required rate plan

20  optimization. They knew what rate plan optimization was, as it is a term often used in the industry;

21  the Carriers regularly provide it to their large commercial customers. And they knew that abiding by

22  the contracts' terms would substantially cut into their profits. The Carriers knowingly chose not to

23  make good on their contractual commitments.

24          7.      As a result, the Carriers overcharged the City of Los Angeles—and the taxpayers who

25  provide the funds—by tens of millions of dollars.

26                                          **PARTIES**

27          8.      Plaintiff-Intervenor is the City of Los Angeles, including its agencies and departments

28  (the "City" or "Plaintiff"), that by this Complaint intervenes in this action pursuant to the California

                                          - 3 -
                        **CONSOLIDATED COMPLAINT IN INTERVENTION**

1    False Claims Act, Cal. Gov't Code §§ 12650 et seq. (the "False Claims Act" or "FCA"). *See id.*

2    § 12652(c)(8)(E).

3         9.     The Defendants (collectively, "Defendants," "Carrier Defendants," or "Carriers") are:

4              a.     Cellco Partnership d/b/a Verizon Wireless ("VERIZON"). VERIZON is a

5    Delaware general partnership with its principal place of business in New Jersey.

6              b.     Nextel of California, Inc., d/b/a Nextel Communications and Sprint Nextel;

7    and Sprint Solutions, Inc. (collectively, "SPRINT"). Nextel of California, Inc. is a Delaware

8    corporation with its principal place of business in California. Sprint Solutions, Inc. is a

9    Delaware corporation with its principal place of business in Kansas.

10             c.     New Cingular Wireless National Accounts, LLC d/b/a Cingular Wireless, now

11   known as AT&T Mobility National Accounts LLC ("AT&T"). AT&T is a Delaware limited

12   liability company with its principal place of business in Georgia.

13        10.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as

14   Does 1-30, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

15   amend this complaint to allege the true names and capacities of these Defendants when they are

16   ascertained. Plaintiff is informed and believes that each fictitiously named Defendant is legally

17   liable as alleged herein.

18                    **GOVERNMENT CONTRACTS FOR PURCHASE OF**
                      **WIRELESS SERVICES IN CALIFORNIA**
19

20        11.    The CWC and WSCA contracts that formed the backbone of the Carriers' obligations

21   to the City were developed as cooperative purchasing agreements in 2005, 2006, and 2012. Each

22   Carrier Defendant entered into one or more of the contracts, and the terms and conditions of those

23   contracts were then incorporated into contracts the Carrier Defendants had with the City, and applied

24   to sales by the Carrier Defendants to the City. The CWC and WSCA contracts each required the

25   Carrier Defendants to provide 1) rate plan optimization reports, and 2) service at the "lowest cost

26   available."

27        12.    The California Department of General Services ("DGS") developed the first of the

28   form contracts, the CWC. The Western States Contracting Alliance, a cooperative purchasing

- 4 -

1  program of the National Association of State Procurement Officers ("NASPO"), put together the

2  second and third agreements, the WSCA contracts.

3                    <u>**Cooperative Purchasing Contracts**</u>

4        13.    Cooperative purchasing contracts allow two or more government entities to purchase

5  services under the same contract terms and conditions.  They can result from centralized state

6  procurement, offering political subdivisions like the City, as well as state agencies, the ability to

7  procure goods or services under a contract entered into by a state agency.  An example is the DGS

8  wireless contract, the CWC, under which the City purchased wireless services from 2006 to 2011.

9        14.    Cooperative purchasing contracts can also be developed by a purchasing cooperative,

10  such as WSCA/NASPO.[1]  In this cooperative purchasing model, a "lead" government agency solicits

11  and enters into one or more master contracts, which other members of the cooperative are then able

12  to adopt and use.  The WSCA contracts are available to all NASPO members, which include the 50

13  states, the District of Columbia, and U.S. territories.  The City purchased wireless services pursuant

14  to the WSCA contracts from 2007 onward.

15        15.    Cooperative purchasing contracts produce lower prices for government purchasers

16  and larger markets for government contractors.  Working together to take advantage of their

17  collective market power, government entities can secure better pricing and terms.  By standardizing

18  products and services and aggregating requirements, governments benefit from the combined

19  economies of scale of multiple organizations, which can be especially beneficial for cities.  For

20  contractors selling to government entities, cooperative purchase agreements provide instant access to

21  the large and lucrative government market.  Vendors can solicit and secure government customers

22  without the burden of a competitive bidding process and the need to negotiate separate agreements

23  with each government customer.

24        16.    Cooperative purchasing also provides benefits with respect to the procurement of

25  products and services that require technical expertise.  Having a single entity develop the contract

26  saves time and money, including the effort required to learn about complicated services and develop

27

28  _____

[1] Long a cooperative purchasing organization of NASPO, WSCA changed its name in 2013 to NASPO ValuePoint
Cooperative Purchasing Organization LLC.

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

1   specialized terms.  According to NASPO, "[c]ooperative purchasing contracts provide higher quality

2   products and services.  By using specialized specification writers, procurement professionals, and

3   technical evaluation committee members, governments are able to produce better contracts for

4   higher quality products and services."  Other government entities using the cooperative purchasing

5   contract can then benefit from the work of the lead agency without having to become technical

6   experts on the procurement matter.  When negotiating with vendors the size and sophistication of the

7   Carrier Defendants, group purchasing creates a more level playing field.

8          17.     In addition, cooperative purchasing greatly streamlines government procurement for

9   both the government customers and contractors.  Without cooperative purchasing, each government

10  purchaser would typically be required to separately solicit bids or quotations and evaluate proposals.

11  Each contractor also would have to prepare responses to such government solicitations, negotiate

12  separate contracts, and maintain a legal and operational infrastructure to administer dozens or even

13  hundreds of dissimilar contracts.

14         18.     In short, a cooperative purchasing agreement can result in substantial benefits for

15  both governments and their contractors.  The benefits to government entities, however, depend on

16  contractors living up to the terms of the agreement.

17                          **Wireless Pricing and Cost Control**

18         19.     The form contracts at issue included specialized provisions designed to reduce costs

19  despite the complex and opaque pricing models the Carrier Defendants devised.  The Carrier

20  Defendants provide wireless services using a multiplicity of "rate plans."  Each Carrier Defendant

21  typically offers dozens of rate plan options at any given time, and frequently changes these plans'

22  features and costs.  In 2012, for example, VERIZON alone promoted upwards of 100 options for

23  voice, text, and data plans to government purchasers under one of the contracts at issue.  It is thus a

24  daunting task for any government agency, and in particular an agency the size of the City, with

25  thousands of employees, to select the most cost-effective rate plan for each employee-user.  Further,

26  the cost effectiveness of a rate plan is not static.  As an individual's usage patterns vary over time,

27  the most cost-effective rate plan one month is often not the most cost-effective plan a few months

28  later.

- 6 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

20.     Rate plan optimization is the industry's process for selecting the most cost-effective rate plan for a phone or wireless device.  It is one of the most effective means of reducing and controlling wireless costs.  Routinely optimizing wireless service accounts using a given Carrier's available rate plans reduces costs by 20% or more, quarter after quarter.

21.     Identifying the most cost-effective rate plan for an individual phone line is difficult and technical.  It requires historical usage data, a complete list of all available rate plans including add-on features and the associated pricing formulas, and a means to match up the usage with the optimal plan.  This process is only made more complicated by the Carrier Defendants' complex rate plan features.  Optimization requires detailed usage data.  For example, selecting the optimal rate plan requires knowing not just the total minutes used during the billing period, but also the time of day calls were made (peak or off peak); whether the other party to a call also purchased service from the same Carrier (in network or out of network); the number of text messages sent; the amount of data sent or received; and so on.

22.     Further, to identify the best rate plan, one also must know all of the rate plans a Carrier makes available, as well as the pricing features of each plan.  As alleged above, this might involve dozens of rate plans, each with a unique pricing formula, some of which are "bundled" with text and data allowances and others that require users to pay for these services separately.

23.     As difficult as this process is for an individual user, it is even more challenging in the context of a large government account, like the City's, where numerous lines of service make up an account.  The City's account requires thousands of lines to be matched to the most cost-effective rate plan available.  Additional variables unique to enterprise accounts, such as shared or pooled usage plans and custom rate plans, must also be factored in to determine the optimal set of plans for the City.  This work must then be done each quarter to maximize the value of optimization.

24.     Given the multiplicity of variables involved in selecting the most cost-effective plan, rate plan optimization is a task uniquely suited for computerized analysis.  The Carrier Defendants frequently hire third party firms to fulfill their contractual commitments to perform optimization analyses.

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

25.     Rate plan optimization has a clear, widely accepted meaning in the wireless industry. Indeed, the WSCA and CWC contracts uniformly impose optimization requirements precisely because those requirements are a standard feature of the Carrier Defendants' commercial contracts. The Carrier Defendants demonstrate their understanding of it when they provide the service to large commercial customers and when they work with third party optimization providers to do the same.

26.     To reduce and control costs for government customers like the City, the DGS and WSCA contracts required the Carrier Defendants to provide rate plan optimization and service at the "lowest cost available." The contracts thus explicitly placed the burden to provide rate plan optimization reports on the Carriers. Despite expressly certifying they would do so, the Carrier Defendants knowingly failed to optimize rate plans in order to preserve revenue and high margins.

## THE CARRIERS PROMISED RATE PLAN OPTIMIZATION REPORTS AND SERVICE AT THE LOWEST COST AVAILABLE TO THE CITY

### The California Wireless Contract—The CWC

27.     On or about May 27, 2005, California's Department of General Services issued an electronic "Request for Proposals," referred to as "eRFP 5014," seeking submissions from wireless Carriers to provide service to California government entities. Following DGS's evaluation of all Carrier responses to eRFP 5014, Defendants VERIZON and SPRINT entered into contracts (the "California Wireless Contract" or "CWC") to provide wireless services.

28.     While DGS issued the eRFP, the CWC was a contract for the entire State of California. California political subdivisions, including the City, could purchase wireless services from VERIZON or SPRINT under the CWC.

29.     In order to reduce costs, the CWC included a provision requiring VERIZON and SPRINT to prepare and deliver rate plan optimization analyses each quarter to every California State agency customer. While the City does not contend that the CWC itself required that the Carriers provide it with rate plan optimization reports automatically (because the City is a political subdivision rather than a State agency), the CWC gave political subdivisions like the City the option to request such reports. The City exercised that option by signing separate contracts with the

1   Carriers (discussed below) that adopted and supplemented the terms of the CWC, and required the

2   Carriers to provide optimization reports to the City automatically.

3       30.     The requirement to provide rate plan optimization reports was contained in Section

4   5.11 of the eRFP, entitled "Agency Reporting Requirements." Section 5.11.2 concerned

5   optimization reports specifically. It provided:

> Wireless Services Optimization Reports <M>
>
> Contractor must provide a quarterly optimization report for each
> wireless service subscriber. The goal of these optimization reports is
> to ensure that each subscriber is utilizing the most appropriate plan.
> This includes identifying subscribers that may be consistently
> incurring overage charges, and therefore should move to a higher plan,
> or subscribers consistently under-utilizing a plan, and therefore should
> move to a lower plan. **When determining the optimal plan for a
> subscriber, Contractor must analyze the effective cost of all plans
> bid (including custom plans) and exclude any months of suspended
> service from the analysis.**
>
> The optimization report will be submitted in electronic and/or
> hardcopy formats on a quarterly basis, by the 15th day of the first
> month of the new quarter. Contractor may be required to submit this
> report to the DGS Contract Administrator and the ATRs ["agency
> telecommunications representatives"] at anytime upon request. Refer
> to Section 8, Exhibits, Required Wireless Reporting Elements for
> minimum required elements.

eRFP 5014 § 5.11.2 (emphasis in original).

31.     Exhibit 8.12 to the eRFP, referenced in Section 5.11.2, set out fourteen items of

information VERIZON and SPRINT were required to include for every "subscriber" or line of

service in the mandatory rate plan optimization reports. These included, "Current [Rate] Plan,"

"Proposed [Rate] Plan," and the Carrier's estimate of the "Potential Savings" that would result from

moving to the proposed optimal rate plan. Consistent with industry meaning and standards,

including the rate plan optimization reports VERIZON and SPRINT provided to commercial

customers, Section 5.11.2 and Exhibit 8.12 specified that the Carriers were obligated to analyze "the

effective cost of all plans bid [and available]" and, for "each subscriber," set forth the "potential

savings" from the rate plan that would yield the lowest cost.

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

32.     The eRFP, incorporated into the resulting contracts, left no doubt that VERIZON and SPRINT were required to provide optimization reports, and that this was a mandatory and material term of the contract.

33.     On its face, Section 5.11 stated that the Carriers "must provide" the listed reports.  As well, the entire section was designated "<M>," which stood for "mandatory."  In addition, the eRFP contained further indicia that certain provisions, including this one, were mandatory.  The eRFP consisted of a series of requirements in numbered paragraphs.  Bidders received a log-in to the eRFP system, permitting them to provide a response to each requirement and additional information, as needed.  Mandatory items, the eRFP stated, were "not negotiable"; a refusal to comply with one would "result in disqualification."  Carriers were required to respond to mandatory terms by checking either a "yes" or "no" on the eRFP system.  "By indicating 'YES,' bidders agree that they shall comply with this term throughout the full term of the contract if the bidder is successful."  The term "shall" was also defined:  "The use of 'shall,' 'must' or 'will' (except to indicate simple futurity) in the eRFP indicates a requirement or condition, which must be met."

34.     The State had authority to waive non-conforming responses only if the deviations were "not material."  A deviation was material "if the deficient response is not in substantial accord with the eRFP requirements . . . or has a potentially significant effect on the . . . amount paid to the bidder, or for the cost to the State.  Material deviations cannot be waived."

35.     The significance and materiality of the optimization requirement were also clear because rate plan optimization has a large and continuing impact on cost.  The eRFP was clear that saving money was a primary purpose of the CWC:  "Cost is the primary evaluation criterion for the award of this eRFP."

36.     The eRFP also included, in Section 1.1, a provision requiring the Carriers to "work with the State to furnish quality wireless equipment and services at the lowest cost available . . . ."

37.     The eRFP cautioned bidders that they were responsible for reading the entire document carefully; "[i]f clarification is necessary, the bidders must submit clarification questions" to a listed procurement official, who would provide responses to such questions by written notice to all bidders.  "If a bidder fails to notify the State, prior to the date fixed for submission of proposals,

1  of a known error in the eRFP or an error that reasonably should have been known to the bidder, the

2  bidder shall submit their proposal at their own risk; and if awarded the contract, the bidder shall not

3  be entitled to additional compensation . . . ."

4     38.    The eRFP required that a "Letter of Acceptance" executed by an authorized Carrier

5  representative accompany submissions: "The Letter of Acceptance is an acceptance of the terms and

6  conditions of the eRFP, and binds the company to those terms and conditions.  This letter shall be on

7  company letterhead and signed by an authorized representative and/or corporate officer of the

8  company."

9     39.    When responding to the eRFP, both VERIZON and SPRINT expressly agreed to

10 comply with Section 5.11.2 and provide the mandated rate plan optimization reports.  Shannon

11 Champion, VERIZON's authorized representative, responded to the eRFP on VERIZON's behalf on

12 or about July 20, 2005.  Concerning Section 5.11.2, Ms. Champion checked "Yes," indicating

13 VERIZON agreed to comply with this mandatory term.  Gray Sigler, on behalf of SPRINT and as its

14 authorized representative, responded to the eRFP on or about July 20, 2005.  Mr. Sigler also checked

15 "Yes," affirming that his company would comply with Section 5.11.2.

16    40.    Following DGS's evaluation of the Carriers' responses to the eRFP, VERIZON and

17 SPRINT executed "Standard Agreements" with DGS.  These Standard Agreements expressly

18 incorporated "the entire eRFP 5014 and Contractor's entire Final Proposal in response to eRFP."

19    41.    H. Leon Frazier, identified as a "Vice President" of Nextel of California, Inc., d/b/a

20 Nextel Communications, a Delaware corporation, executed the SPRINT CWC contract, Agreement

21 Number 1S-05-58-01, on or about October 1, 2005.  While the original contract had a two-year term,

22 it was subsequently extended multiple times until it expired on October 2, 2010.

23    42.    Daniel J. Hess, identified as "Area Vice President—Finance," of Cellco Partnership

24 d/b/a/ Verizon Wireless, a Delaware general partnership, executed the VERIZON CWC contract,

25 Agreement Number 1S-05-58-02, on or about September 30, 2005.  Shannon Champion, identified

26 as VERIZON's "Senior Attorney," approved the CWC "as to form."  While the original contract had

27 a two year term, it was subsequently extended multiple times until it expired on October 2, 2010.

28

- 11 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

### The City's Use of the CWC Contracts

43.     Although the City was able to place orders under the CWC without entering into a separate contract, the City chose to enter into cooperative purchase agreements with Defendants SPRINT and VERIZON adopting the terms of the CWC.  The City did so to ensure it would receive lower cost service by requiring rate plan optimization.

44.     Effective October 27, 2006, SPRINT entered into "a Cooperative Purchase Arrangement, in accordance with" City law "and the prices, terms and conditions stated in the State of California Wireless Contract (CWC)."  The City identifies this agreement as Contract Number 58644.  SPRINT agreed to provide wireless equipment and services to the City in accordance with, and subject to, the terms and conditions of the CWC, which were expressly incorporated in the agreement between SPRINT and the City.  The SPRINT agreement with the City adopting the terms of the CWC was signed by H. Leon Frazier of SPRINT on or around October 2, 2006.

45.     The agreement between the City and SPRINT made one material change to the CWC: The City required SPRINT to provide rate plan optimization directly to the City.  Specifically, the contract stated:

> Optimization:   After the initial plan assignment, Nextel/Sprint will routinely identify those users who are not in the most optimized plan and work with the City Department Telephone Coordinators to place users in the most optimized plan.

This provision obligated SPRINT to provide rate plan optimization "routinely"—not sporadically, not only upon request, but routinely—to City customers.

46.     VERIZON and the City entered in to a contract adopting the prices, terms, and conditions of the CWC, effective July 1, 2006, referred to by the City as Contract Number 58608.  But like the contract between SPRINT and the City, the City once again made one material change to the CWC contract terms.  The contract between VERIZON and the City provided that "[a]fter the initial plan assignment, Verizon Wireless will routinely identify those users that are not in the most optimized plan and work with the [City] to place users in the most optimized plan."  The contract listed Diana Flippin, identified as the "Major Accounts Manager, Government Sales" of VERIZON as the "Supplier Contract" for the agreement.

- 12 -

352217.4

47. The City so modified the agreements, one of the only changes it made when adopting the terms and conditions of the CWC, because it knew the value of rate plan optimization and desired to receive its benefit. SPRINT and VERIZON expressly promised to provide this service to the City to win its business. SPRINT and VERIZON never provided the City with the benefit of its bargain, as is discussed below.

### The WSCA Contracts

48. Beginning in 2007, the City also began contracting for wireless services under the auspices of WSCA. The first contract ("WSCA I") became effective in or about October 2006, and the second ("WSCA II") became available as of approximately April 2012. Both contracts required the Carrier Defendants to prepare quarterly "optimization reports" identifying the lowest cost rate plan for each user or phone, as well as to provide service at the "lowest cost available."

49. The State of Nevada was the "lead state" that managed the negotiation of these agreements for WSCA. As the lead state, Nevada issued a "Request for Proposal" ("RFP"), which set forth the proposed material terms of the anticipated contracts, with limited exceptions, including guidelines for the Carriers' pricing proposals. The RFP also specified the process by which the contract terms would be fixed. Specifically, responding Carriers were required to submit a form certifying that they understood and would comply with all terms of the RFP, except any terms the Carrier expressly identified and to which it took exception. Following receipt, Nevada evaluated the Carriers' submissions, including pricing and qualifications, and attempted to negotiate any terms as to which a Carrier had objected.

50. As described in detail below, written contracts were eventually entered into between Nevada and each Carrier Defendant, in the form of a Nevada standard form "Contract for Services of Independent Contractor." These contracts expressly incorporated the underlying RFP, the Carriers' responses to the RFP, and any additional terms agreed upon in writing as a result of a Carrier's objection to a term in the RFP. After the Nevada contracts became effective, states seeking to utilize them had to enter into "Participating Addenda," which incorporated the terms of the Nevada contracts and enabled state agencies, as well as a participating state's political subdivisions, to

- 13 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

procure services under the terms of the WSCA contracts. The City's ultimate contracts with the Carriers pursuant to WSCA incorporated each of these components.

**WSCA I**

51.     On WSCA's behalf, the State of Nevada's Division of Purchasing issued the RFP for WSCA I on or about February 8, 2006. The RFP set forth the terms of a proposed model contract that government entities could utilize to purchase wireless services from Carriers.

52.     The WSCA RFP explicitly made cost the most important factor in evaluating proposals. Under the heading "Proposal Evaluation and Award Process," the RFP stated that Carrier proposals would be evaluated and scored based upon six criteria, the first and most important of which was "[r]easonableness of cost."

53.     The highly detailed RFP included most material terms of the contract. The RFP itself stressed that the terms of the RFP were material. Section 9.26 stated that "[v]endor understands and acknowledges that the representations above are material and important, and will be relied on by the state in the evaluation of the proposal. Any vendor misrepresentation shall be treated as fraudulent concealment from the State of the true facts relating to the proposal."

54.     The RFP specifically provided that contracts resulting from it would incorporate its terms. Further, it delineated a single path to depart from its dictates: A Carrier had to take specific exception to a term *and* Nevada and the Carrier had to agree to modify it. In addition, both steps had to be memorialized in writing.

55.     Responding Carriers specifically certified that they would comply with the RFP's terms and conditions. A "Submission Checklist," included in the RFP, identified "[d]ocuments that must be submitted with each package in order to be considered responsive." Among the required documents was "Attachment B," a "Certification of Compliance With Terms and Conditions of RFP." Attachment B, which appears below, required a Carrier's authorized representative to certify that she had read, understood, and agreed to comply with the RFP's terms and conditions. The Carrier could check "YES" to indicate "acceptance of all terms and conditions," or "NO" to denote "non-acceptance," as "detailed below." Attachment B also noted, "In order for any exceptions to be considered they **MUST** be documented." (Emphasis in original.) Section 9.24 of the RFP further

- 14 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

1   stated that Attachment B "shall constitute an agreement to all terms and conditions specified in the

2   RFP . . . except such terms and conditions that the vendor expressly excludes."  Responding Carriers

3   were instructed to bring any "irregularities or lack of clarity in the RFP" to the attention of an

4   individual designee in the Nevada Purchasing Division.

**Attachment B**
**CERTIFICATION OF COMPLIANCE WITH**
**TERMS AND CONDITIONS OF RFP**
**PRIMARY VENDOR**

I have read, understand and agree to comply with the terms and conditions specified in this Request for Proposal.

Checking "YES" indicates acceptance of all terms and conditions, while checking "NO" denotes non-acceptance and vendor's exceptions should be detailed below.  In order for any exceptions to be considered they MUST be documented.

YES _____ I agree.     NO _____ Exceptions below:

SIGNATURE _____          _____
                              Primary Vendor                                                             Date

PRINT NAME _____
                              Primary Vendor

**EXCEPTION SUMMARY FORM**

| RFP SECTION NUMBER | RFP PAGE NUMBER | EXCEPTION (PROVIDE A DETAILED EXPLANATION) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Attach additional sheets if necessary.  Please use this format.

This document must be submitted in the "State Documents" section/tab of vendors' technical proposal

56.     Section 7.11 of the RFP provided that a Carrier's proposal "must be signed by the

individual(s) legally authorized to bind the vendor . . . ."

- 15 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

57. Section 9.25 of the RFP provided that the following contract documents would be incorporated into the final agreement, and "control in the following order of precedence: the final executed contract, the RFP, and modifications and clarifications to the awarded vendor's proposal, and the awarded vendor's proposal."

58. Section 3 of the RFP, entitled "Scope of Work," included a general requirement that "[a]ll services proposed by the responding contractors, shall meet each specific requirement listed in this section." The RFP provided that the terms "Shall/Must/Will" "[i]ndicate[] a mandatory requirement." This section contains the two requirements at issue in this case.

59. The first requirement, set forth under the heading "General Services," was to "[p]rovide quality wireless equipment and services at the lowest cost available . . . ." WSCA I RFP § 3.1.1.

60. Section 3.2.2.2 also included a "mandatory requirement" that the Carrier Defendants provide quarterly optimization reports:

3.2.2 <u>Reporting</u>
3.2.2.1 Reporting shall be provided in electronic format via e-mail or CD in Excel, with hardcopies available upon request at no extra charge. See Attachment F "Quarterly Report Format".
3.2.2.2 The following reports shall be submitted for the respective quarter:
- Usage and purchases under the contract.
- Quarterly optimization report for each wireless service subscriber. The goal of these optimization reports is to ensure that each subscriber is utilizing the most appropriate plan. This includes identifying subscribers that may be consistently incurring overage charges, and therefore should move a more cost effective plan or subscribers consistently under-utilizing a plan; and therefore should move to a lower cost plan.
- Voice and combined voice/walkie-talkie related reports upon request.
- Data related usage reports upon request.

61. Each Carrier Defendant certified and agreed to comply with both Sections 3.1.1 and 3.2.2.2.

62. On or about March 15, 2006, Cathleen Pryor, an authorized AT&T representative, executed a "Certification of Compliance with Terms and Conditions of RFP," certifying that she had

- 16 -

352217.4

1   read and understood the RFP.  AT&T agreed to comply with both sections and took no exception to

2   either one.

3       63.    On or about March 10, 2006, H. Leon Frazier, an authorized representative of

4   SPRINT, executed a "Certification of Compliance with Terms and Conditions of RFP," certifying

5   that he had read and understood the RFP, and that SPRINT agreed to comply with Sections 3.1.1 and

6   3.2.2.2., and took no exception to them.

7       64.    On or about March 15, 2006, Roger Gurnani, the "West Area President" and an

8   authorized representative of VERIZON, executed a "Certification of Compliance with Terms and

9   Conditions of RFP," certifying that he had read and understood the RFP, and that VERIZON agreed

10   to comply with, and took no exception to, either section.

11       65.    Nevada evaluated the Carrier Defendants' RFP responses and negotiated

12   modifications to certain terms to which each Carrier had objected; none of those modifications are

13   relevant to the Carrier Defendants' obligations at issue in this case.

14       66.    Each Carrier Defendant then entered into an agreement, titled a "Contract for

15   Services of Independent Contractor," with the State of Nevada (the "Nevada WSCA I Contracts").

16   As the authorized AT&T representative, Cathleen Pryor, the "Director, Contracts," executed the

17   agreement on or about August 31, 2006.  SPRINT's authorized representative, H. Leon Frazier,

18   "V.P., Public Sector," executed the agreement on or about September 8, 2006.  VERIZON's

19   authorized representative, Roger Gurnani, "West Area President," executed the agreement on or

20   about August 29, 2006.  Each agreement included a representation that the individuals executing

21   them had "full power and authority to enter into this Contract."  In each instance, the Carrier

22   Defendants warranted that "all services, deliverables, and/or work product under this Contract shall

23   be completed in a workmanlike manner consistent with standards in the trade, profession, or

24   industry."

25       67.    The Nevada WSCA I Contracts were alike in all relevant respects.  Each recited that

26   it incorporated the RFP ("Attachment AA" to the agreement), any negotiated items ("Attachment

27   BB"), and the Carriers' responses to the RFP ("Attachment CC"), with these three documents given

28   precedence in that order for purposes of construing the agreement.

**CONSOLIDATED COMPLAINT IN INTERVENTION**

1    68.    None of the specially negotiated terms concerned or in any way modified Sections

2    3.1.1 and 3.2.2.2 of the RFP; accordingly, these sections as set forth in the RFP are the controlling

3    terms of the Nevada WSCA I Contracts and consequently the contracts entered into by political

4    subdivisions under WSCA I.  Narratives inserted by the Carrier Defendants in their RFP responses

5    were irrelevant; by signing the Nevada WSCA I Contracts, the Carrier Defendants agreed to comply

6    with the terms of the RFP itself with respect to the requirements for optimization reports and service

7    at the lowest cost available.  The contracts also provided that they could not be modified or

8    amended, "unless the [amendment] . . . is in writing and signed by the respective parties hereto and

9    approved by the Office of the Attorney General and State Board of Examiners."  No modifications

10   with respect to the relevant provisions were executed according to these rules.

11                                        **WSCA II**

12   69.    The State of Nevada issued an RFP for the second WSCA wireless contract, WSCA

13   II, on or about February 3, 2011.  A substantially similar process as for WSCA I governed the

14   submission and evaluation of proposals, as well as the creation of the contracts entered into under

15   the form contract.  As before, the WSCA II RFP set forth the material terms of the proposed

16   contracts, and required a responding Carrier to execute a "Certification of Compliance with Terms

17   and Conditions of RFP," certifying that the Carrier would comply with the terms and conditions set

18   out in the RFP.  The RFP provided that all of the terms and conditions stated in the RFP would

19   become part of the resulting agreement, except those terms to which the responding Carrier

20   specifically took exception and which Nevada agreed to modify.

21   70.    The WSCA II RFP also included the same cost-saving provisions as WSCA I.  The

22   "Scope of Work," under the heading "General Requirements," again mandated that the Carriers were

23   to provide service at the "lowest cost available."  Section 3.1.2 required the Carriers to "[p]rovide

24   quality wireless voice services, wireless broadband services, equipment and accessories at the lowest

25   cost available in a timely and efficient manner."

26   71.    The WSCA II RFP again required the Carrier Defendants to provide quarterly

27   optimization reports.  Under the heading "Reporting," Section 3.3.2.2 identified optimization reports

28   as one of the reports that "shall be submitted for the respective quarter":

                                        - 18 -
                        **CONSOLIDATED COMPLAINT IN INTERVENTION**

> Quarterly optimization report for each wireless/broadband service subscriber and orders placed for accessories. The goal of the optimization reports is to ensure that each subscriber is utilizing the most appropriate plan. This includes identifying subscribers that may be consistently incurring overage charges, and therefore should move to a more cost effective plan or subscribers consistently under-utilizing a plan, and therefore should move to a lower cost plan.

WSCA II RFP § 3.3.2.2.

72. Each Carrier Defendant again agreed to provide services at the "lowest cost available," and to prepare and deliver optimization reports each quarter. As before, the WSCA II RFP required a Certification of Compliance with Terms and Conditions of RFP, identified as Exhibit B1. The form cautioned that "[i]n order for any exceptions and/or assumptions to be considered, they **MUST** be documented in detail in the tables below." (Emphasis in original.) None of the Carrier Defendants took exception to the optimization provisions or requested clarification as to their meaning.

73. All three Carrier Defendants certified they would provide service to government entities like the City at the lowest cost available and each quarter would determine which rate plan among those available would yield the lowest cost for each line of service.

74. Nevada awarded contracts to each Carrier Defendant (the "Nevada WSCA II Contracts"). The Nevada WSCA II Contracts that AT&T and SPRINT executed expressly incorporated the WSCA II RFP, referred to as the "Solicitation"; the Carriers' responses to the RFP; and any special terms negotiated in view of exceptions the Carriers took, referred to as the "Contractor's Special Terms and Conditions." As relevant here, these two agreements laid out the following order of constructive precedence in the event of any conflict: the applicable Participating Addendum; the Master Service Agreement, referring to the Nevada WSCA II Contracts; the Contractor's Special Terms and Conditions; the RFP, called the "Solicitation"; the Contractor's Response to the RFP; and, in the case of AT&T only, any individual order a Participating Entity placed on the contract. AT&T's agreement further stated: "Neither the Special Terms and Condition[s], nor any purchase order(s) issued under the Contract shall contradict or supersede any terms and conditions in the Contract without written evidence of mutual assent to such change(s)" between AT&T and Nevada. SPRINT's agreement said the same, and added that "[a] Contractor's

- 19 -

352217.4

1  attachment shall not contradict or supersede any WSCA specifications, terms or conditions without

2  written evidence of mutual assent to such change appearing in this Contract."

3       75.    The Nevada WSCA II Contract that VERIZON executed also expressly incorporated

4  in descending order of constructive precedence the WSCA II RFP, referred to as the "Solicitation";

5  the Carriers' responses to the RFP; and any special terms negotiated in view of exceptions the

6  Carriers took, referred to as the "Contractor's Additional Terms." The agreement also stated that

7  "[a] Contractor's attachment shall not contradict or supersede any WSCA specifications, terms or

8  conditions without written evidence of mutual assent to such change appearing in this Contract."

9       76.    In no case did the Contractor's Additional Terms or Contractor's Special Terms and

10  Conditions as incorporated in the Nevada WSCA II Contracts contradict or modify the provisions of

11  Section 3.1.2, the "lowest cost available" requirement, or of Section 3.3.2.2, the "rate plan

12  optimization" requirement. Accordingly, these are the controlling terms of the Nevada WSCA II

13  Contracts.

14       77.    AT&T's authorized representative, identified as Roland Saenz, "Director of

15  Contracts," executed the Nevada WSCA II Contract on or about March 14, 2012. Attachment AA,

16  Contractor's Special Terms and Conditions, did not purport to alter Sections 3.1.2 or 3.3.2.2.

17       78.    SPRINT's authorized representative, Paget L. Alves, "Chief Sales Officer," executed

18  the Nevada WSCA II Contract on or about April 9, 2012. Attachment AA, Contractor's Special

19  Terms and Conditions, made no reference to Section 3.3.2.2 and did not otherwise change the

20  requirement to provide optimization reports.

21       79.    VERIZON's authorized representative, Todd Loccisano, "Executive Director

22  Enterprise & Government Contracts," executed the Nevada WSCA II Contract on or about April 13,

23  2012. Attachment CC, Contractor's Special Terms and Conditions, contained no reference to

24  Sections 3.1.2 or 3.3.2.2.

25       **WSCA Participating Addenda and the California Request for Offers**

26       80.    The next step in the WSCA contracting process was the creation of "Participating

27  Addenda" or "PAs." This was required by the Nevada WSCA contracts for any state or political

28  subdivision wishing to participate in them. As NASPO describes it, a PA is

a bilateral agreement executed by a Contractor and a Participating Entity incorporating the terms and conditions included in the original solicitation and any other additional Participating Entity specific language or other requirements, e.g. ordering procedures, or other terms and conditions unique to the participating entity. The purpose of a Participating Addendum is to afford each party using a NASPO ValuePoint contract the protection of the solicitation's terms and conditions.

81. The State of California entered into PAs under WSCA I with AT&T in 2006 (AT&T was not a contractor under CWC), and with SPRINT and VERIZON in 2010. When WSCA II replaced WSCA I, California amended or entered into new PAs with each Carrier Defendant.

82. California's PAs allowed the City to participate in the WSCA contracts with the Carriers, as each PA entered into by California defined authorized purchasers as all state agencies and political subdivisions. The PAs defined political subdivisions as "any city, county, city and county, district, or other local governmental body or corporation, including the California State Universities (CSU) and University of California Systems, K-12 school[s] and community colleges[,] empowered to expend public funds."

83. The City, therefore, was an authorized purchaser under the California statewide PAs for the WSCA contracts, and could make purchases subject to the terms and conditions of the WSCA contracts. The PAs incorporated the terms of the related Nevada WSCA contracts; they did not amend or relieve the Carrier Defendants from their obligations to provide quarterly rate plan optimization reports and service at the "lowest cost available."

84. In 2010, the State of California decided to use the WSCA regime exclusively for California agencies and not to renew the CWC. In or around November 2010, DGS issued a "Request for Offer," RFO DGS-1070 ("RFO"), directed to wireless Carriers who had WSCA contracts, so that California-specific terms could be negotiated with the WSCA Carriers for inclusion in PAs and amended PAs pursuant to what was then WSCA I. The RFO stated that WSCA Carriers "must adhere to the administrative and technical requirements in this RFO," with "Yes" or "No" responses to each of its provisions, and "the use of 'shall,' 'must' or 'will' indicat[ing] a requirement or condition that must be met." RFO responses "shall include a cover letter on company letterhead stating that the prospective WSCA [wireless provider] agrees to all of the State's requirements."

- 21 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

85.     The RFO, Section 7.15, outlined the Carriers' reporting responsibilities, and made clear that such reports "shall reflect State and local governmental agencies usage and purchases." Elsewhere, the RFO required the Carriers to take steps to protect the confidentiality of individual user data in their reports, and reiterated that "[t]he State will require information for reporting purposes for both State and local governmental agencies." Although reporting was required for both state and local government entities, the RFO required that "State and Local Governmental Agency reports shall be separated."

86.     The RFO required optimization reporting. Specifically, Section 7.16.2 of the RFO stated:

> WSCA [wireless providers] must provide a quarterly optimization report for each wireless service subscriber. The goal of this optimization reports to [sic] ensure that each subscriber is utilizing the most appropriate plan. This includes identifying subscribers that may be consistently incurring coverage [sic] charges and therefore should move to a higher plan or subscribers consistently under-utilizing a plan and therefore should move to a lower plan. When determining the optimal plan for a subscriber, WSCA [wireless providers] must analyze the effective cost of all plans offered and exclude any months of suspended service from the analysis.

87.     Each Carrier Defendant responded "Yes" to Section 7.16.2, indicating it would comply with that provision.

88.     The RFO and the Carriers' responses to the RFO were incorporated into PAs entered into after the RFO process was complete in or around 2011. The RFO and the Carriers' responses reaffirmed the Carriers' obligation and agreement to provide optimization reports for California political subdivisions, including the City, above and beyond what was required by the WSCA contracts.

89.     AT&T first entered into a state-level PA with California under WSCA I in or around February 27, 2007 (contract number 7-06-70-01). The PA authorized California political subdivisions such as the City to purchase wireless services from AT&T under WSCA I. Cathleen M. Pryor, listed as the "Director, Contracts," was AT&T's primary customer contact. AT&T's designated contract manager pursuant to the RFO was Twila Lively. Later, Theresa Page, "Senior Contract Manager," executed a new PA for AT&T (contract number 7-11-70-17).

- 22 -

352217.4

90.     SPRINT representative Paget Alves, "Chief Sales Officer," executed a PA with California (contract number 7-10-70-15), as well as SPRINT's response to the RFO, in which SPRINT stated that it had "read, understands, and will comply with the terms, conditions, specifications and requirements of the RFO," subject to certain objections it made to terms other than the optimization requirement.  The parties subsequently amended the agreement to incorporate the provisions of the RFO and WSCA II, among other things.

91.     VERIZON entered into a PA with California under WSCA I in or around September 30, 2010 (contract number 7-10-70-16).  Todd Loccisano, "Executive Director, Sales Operations," executed the PA for VERIZON.  Chris Rock, identified as the "National Account Manager," executed VERIZON's RFO response.  The parties subsequently amended the agreement to incorporate the provisions of the RFO and WSCA II, among other things.

## The City's Agreements with the Carrier Defendants Adopting WSCA

92.     Although neither the WSCA contract nor California required it, the City chose to enter into its own agreements with the Carrier Defendants pursuant to WSCA.  These agreements each incorporated the terms and conditions of the related master contracts; none of them relieved the Carrier Defendants from their obligations to provide quarterly rate plan optimization reports and service at the "lowest cost available."

93.     AT&T and the City entered in to an agreement effective March 1, 2007, adopting the "prices, terms and conditions stated in the Western States Contracting Alliance RFP/Contract Number 1523."  The contract was signed on behalf of AT&T by Chris K. Hill, identified as a Vice-President, on February 12, 2007.  Robert Sottile was identified by AT&T as the "contact person" for the agreement.  In addition to the optimization provisions of the incorporated WSCA 1523 RFP, this separate agreement also stated that AT&T would "routinely identify those users that are not in the most optimized plan and work with the City . . . to place users in the most optimized plan."

94.     In 2013, AT&T and the City renewed their agreement, effective May 1, 2013, expressly adopting and incorporating "the prices, terms and conditions stated in the Contract between Western States Contracting Alliance (WSCA) acting by and through the State of Nevada and [AT&T] RFP/Contract No. 1907" along with the terms of the California statewide Participating

- 23 -

1    Addendum.  As with the earlier agreement with AT&T, this agreement also stated that AT&T would

2    "routinely identify those users that are not in the most optimized plan" and "work with" City

3    personnel "to place users in the most optimized plan."  This agreement identified Twila Lively,

4    Theresa Page, and Robert Sottile as contacts for AT&T.

5            95.      SPRINT and the City entered in to an agreement expressly adopting the terms of

6    WSCA 1523 effective July 1, 2011.  Bill Springer and Geoff Jaime of Sprint were identified as the

7    responsible individuals for SPRINT under this agreement.  This agreement, Contract Number 59288,

8    continued in effect until February 1, 2013, when it was replaced by Contract Number 59510 between

9    SPRINT and the City, which adopted the prices, terms, and conditions of WSCA 1907.  This 2013

10   contract included a provision that Sprint would "routinely identify those users that are not in the

11   most optimized plan" and work to reassign them to "the most optimized plan," but specified for the

12   first time that such reports would be provided "upon written request of the City (but in no event

13   more than once per quarter)."  No agreement between SPRINT and the City, including the CWC and

14   the first WSCA agreement, had previously required that the City make a request in writing for

15   optimization reports.

16           96.      VERIZON and the City entered in to an agreement expressly adopting the terms of

17   WSCA 1523 effective September 1, 2011.  In addition to the optimization provisions of WSCA 1523

18   the agreement provided that "Verizon Wireless shall work with the City Departments optimizing the

19   rate plans by providing bill analysis and pricing update [sic] on a regular basis."  Effective March 1,

20   2013, Verizon and the City entered in to an agreement adopting the terms and conditions of WSCA

21   1907.  For the first time, and similar to the 2013 SPRINT contract, this agreement provided that

22   "Verizon Wireless shall not be required to provide rate plan optimization reports except upon

23   specific written request" by an authorized representative of the City.

24                            **The Carrier Defendants Failed to Provide**
                        **Rate Plan Optimization Reports as the Contracts Required**
25
             97.      Notwithstanding multiple certifications and their commitments under the CWC,
26
     WSCA I, WSCA II, the RFO, and their agreements with the City, the Carrier Defendants failed to
27
     identify the lowest cost rate plans when billing the City.  They did not identify the optimal rate plan
28

- 24 -
**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

for each line of service on a quarterly or other routine basis. And, having failed to identify optimal rate plans, they did not recommend those plans to the City or use those rate plans to achieve the lowest cost available when invoicing the City.

98.     Despite the multiple promises they made under each relevant contract to prepare quarterly optimization reports for government customers, Plaintiff is unaware of any Carrier Defendant that actually did so. Put simply, the Carrier Defendants did not routinely produce such reports and the City did not receive them. It is true that the Carrier Defendants sporadically prepared reports related to rate plan selections, often in response to requests from City departments or representatives. Neither in their substance nor their frequency, though, were these the optimization reports the contracts required to be provided "routinely" and "quarterly."

99.     The CWC, both WSCA RFPs, and the RFO each provides a straightforward description of what is required in an optimization report. In addition, the term has a well-recognized meaning in the wireless industry, one which the Carrier Defendants regularly used in their dealings with commercial customers. This definition is entirely consistent with the language in the contract documents, such that the Carrier Defendants knew exactly what sort of report the RFP and RFO documents requested.

100.     Some of the reports provided to the City by the Carrier Defendants compiled usage data or considered alternative rate plans. But while they often bore false and misleading titles that included phrases like "plan optimization" and "price analysis," and were formatted to resemble optimization reports, these pseudo reports were not the genuine article. In those reports the Carrier Defendants made available, true rate plan optimization analyses were not to be found.

101.     Three types of these reports are worth noting. First, the Carrier Defendants frequently supplied "usage reports" to the City or its departments. Usage reports presented raw, line-by-line usage data. Such data is a necessary component of a rate plan optimization analysis, but hardly sufficient on its own. Such raw data is routinely provided in monthly bills that all customers receive. The value of rate plan optimization is in the *analysis* of this usage data and potential plan match ups.

102.   AT&T, for example, periodically provided the City with usage reports that conveyed raw data—and little else.  Premier, AT&T's online customer portal, makes usage reports available to its customers; before Premier was operational, AT&T offered these same reports to customers on a CD-ROM the company called a "WIN CD."  But the benefits of true optimization reports were unattainable with the portal or the CDs.  Neither provided information about AT&T's dizzying and ever-changing rate plans; neither provided the computer software necessary to determine optimal rate plans for each line.  And even if *all* the required data had been provided, it would have forced the City to undertake the massive effort itself to perform routine optimization analysis, a complex task that AT&T had promised to do as part of its bargain.

103.   The other Carrier Defendants disseminated similar raw usage reports to the City in hard copy or electronic forms, but these also did not comply with the contractual requirement to prepare optimization reports.

104.   Second, each Carrier also offered a variant of an "overage report" to the City.  An overage report analyzes usage and billing information for a certain time interval and recommends line-by-line changes.  Unlike rate plan optimization analyses, overage reports are one-way ratchets that only recommend *more* expensive plans for lines that exceed plan allowances, but do not suggest *less* expensive plans for lines that do not surpass usage limits.  This is not a savings tool for customers, but a profit-maximizing device for the Carriers.

105.   An example of an "overage report" is the "monthly bill review" or "Quarterly Business Review" VERIZON periodically provided to some government customers.  These reports identified voice and data overages and made line-specific recommendations for more expensive, *higher* volume rate plans that lines with overages should switch to.  They did not, however, make recommendations for cheaper, *lower* volume rate plans that lines that did not use their allotted voice, text, or data allowances should choose instead.

106.   AT&T's "Stewardship Report" is another example of an "overage report" sales representatives periodically provided to some government customers.  This presentation and corresponding spreadsheets similarly focused on lines that incurred overage charges because they used more voice, text, and data than they were allotted.  As with other reports the Carrier Defendants

- 26 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

1  produced, AT&T's "Stewardship Report" failed to analyze lines of service whose usage was *lower*

2  than the selected rate plan allowed, focusing instead on lines with overage charges to persuade

3  customers to purchase costlier plans.

4  107.    Finally, the Carrier Defendants provided the City with a third type of report used to

5  promote new rate plans or analyze possible changes.  Like rate plan optimization analyses, these

6  reports purported to analyze a customer's usage, make line-by-line recommendations, and project

7  savings if the customer made the changes.  Unlike optimization reports, these reports failed to

8  consider all available plan options for each line of service and then to select the most cost-efficient

9  among them.  Instead these reports were mere marketing tools the Carrier Defendants used to

10  promote certain rate plans, such as new rate plan options.  Because these analyses ignored the full

11  range of rate plans available under the contracts, they are a far cry from rate plan optimization

12  reports.

### The Carrier Defendants Knowingly Failed to Provide
### Rate Plan Optimization Reports and Service at the Lowest Cost Available

108.    As set forth above, the Carrier Defendants stated throughout the parties' contracts that

they would provide optimization reports.  The Carrier Defendants know what optimization reports

are, as the term is commonly used in the wireless industry, and the Defendants regularly provide

such reports to commercial customers.  If the Carrier Defendants had any question about the scope

or nature of the contractual requirements to provide optimization reports and service at the lowest

available cost, the RFPs required them to ask clarifying questions.  Their failure to do so further

demonstrates they understood these terms of the RFPs and RFO.

109.    Despite their RFP and RFO responses, each Carrier Defendant failed to take the

actions necessary to ensure it fulfilled the contracts' requirements.  Each Carrier Defendant failed to:

a.    secure or authorize the resources required to prepare rate plan optimization

reports each quarter for each government account, including personnel with the necessary

expertise, the required software and data systems, and the funds required to pay for the effort;

b.      communicate to the personnel who regularly administered the City's contracts that those contracts required quarterly rate plan optimization reports to be prepared and delivered automatically and routinely, whether or not the customer requested them;

c.      direct that rate plan assignments are analyzed and new rate plan assignments are recommended each quarter or routinely in order for the City to be able to procure wireless services at the lowest cost available; and

d.      otherwise take the actions required to ensure compliance and prevent the breaches and violations alleged in this Complaint in Intervention.

110.     The Carrier Defendants' affirmative representations that they would comply with the contracts—in their responses to the RFPs, related documents, and the resulting contracts generally, and in the provisions requiring rate plan optimization and service at the lowest cost available specifically—were false and materially misleading, and contained deceptive half-truths. The Carrier Defendants were not prepared to analyze rate plan assignments for all City users quarterly or routinely, as the contracts required, when the Carrier Defendants responded to the RFPs or executed the contracts. Truthful responses would have disclosed that the Carrier Defendants had not secured the resources or developed a viable plan to provide the required optimization reports.

111.     In response to the WSCA I RFP, for example, AT&T (then known as Cingular) took no exception to the optimization requirement found in Section 3.2.2.2. AT&T represented that it accepted the provision and would comply with it. AT&T stated in its narrative response: "Cingular will comply with this requirement via our WIN CD software described in 3.2.2.1 above and through the dedicated Project manager."

112.     Similarly, in response to the optimization requirement in the State's RFO, AT&T represented that it would take actions to fulfill its contractual commitment:

> AT&T will provide the ability for [Agency Telecommunications Representatives] ATR's and Contract Administrators to access quarterly optimization reports. AT&T Service Managers will create a Premier online site for each ATR. The Service Manager will give each ATR the tools needed to create exception and optimization reports that, once built, will populate the needed data each billing period for the ATR. Service Managers also perform manual account optimization analysis quarterly as part of a . . . Stewardship report.

- 28 -

113.    These statements by AT&T were false and misleading.  In fact, the WIN CDs mentioned in the WSCA I narrative did not contain complete optimization reports or the data or software needed to prepare optimization reports.  Likewise, the City could not obtain optimization reports through the Premier web portal; indeed, the City is informed and believes that AT&T has failed to create this functionality up to the present.

114.    In its response to the WSCA II RFP, AT&T again took no exception to the optimization provision, now found in renumbered Section 3.3.2.2.  In its narrative, AT&T simply stated, "AT&T will provide quarterly optimization reports for each subscriber."  Following this unconditional statement, AT&T went on to say:

> Based on the extremely large anticipated volume of use at the WSCA Master Contract level, AT&T will develop a customized reporting function to provide summary data that may be used by WSCA and the Participating Entities in determining the most appropriate plan. AT&T will work with WSCA to determine how the data will be customized to meet the needs of the Participating Entities.

> Currently, AT&T complies with the quarterly optimization report requirement through our Premier Platform at the agency level. Premier provides Participating Entities, on a monthly basis, the information they need to evaluate if an End User is utilizing the most appropriate plan.

115.    If AT&T intended not to prepare optimization reports each quarter, but instead to provide only some portion of the data needed and no optimization analysis, AT&T's representation that it would "comply" and "provide" optimization reports was false.  To make these statements not misleading, AT&T would have had to represent that it would not comply, but would instead only provide some data, leaving the most valuable part of the bargained-for promise, the optimization analysis, to the City.

116.    Similarly, VERIZON represented in its response to the CWC RFP that it would comply with the requirement to provide quarterly optimization reports, stating it was "confident that our Internet Billing Analysis System (IBAS) . . . will meet all of the State's reporting needs."  To the extent this statement was a representation that IBAS included optimization reports, it was false; IBAS did not.

- 29 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

117.    When responding to the WSCA I RFP, VERIZON stated, "Verizon Wireless will provide the quarterly optimization report as an additional report along with Attachment F [an administrative report the contract required]. The data requested in the quarterly optimization report is quite voluminous and therefore this document will be sent separately in CD format to the State of Nevada. With approximately 200,000 line subscribers, additional resources will have to be dedicated to the production of this report." VERIZON, however, did not prepare and provide optimization reports, because management decided not to allocate the "additional resources" VERIZON acknowledged were required. The representation that VERIZON was prepared and willing to do so was false.

118.    As it routinely did when optimization reports were needed for commercial customers, VERIZON contacted a rate plan optimization firm, eOnTheGo, about preparing the reports the CWC and WSCA I required. Shortly thereafter, however, a VERIZON employee told eOnTheGo that senior VERIZON executives refused to fund the optimization work and decided not to prepare optimization reports as the contract required.

119.    In connection with WSCA II, VERIZON represented in its response to the RFP that it would provide quarterly optimization reports "as part of a Quarterly Business Review," and touted that it would include "personalized recommendations on price plans and equipment based on analysis of the data." The representation that these quarterly reviews include optimization reports was false; they do not. Moreover, while VERIZON account representatives sometimes provided the City with reports that looked like or were sometimes falsely represented to be optimization reports, they were not. As described above, the reports VERIZON provided—either to show the benefits of new rate plans or to highlight lines that incurred overage costs—were not optimization reports for a simple reason: They did not analyze the cost of service under all available rate plans and identify the lowest cost alternative plan. Other ad hoc efforts at compliance, such as when VERIZON provided optimization analyses in response to demands from City personnel, did not fulfill VERIZON's obligation to prepare bona fide optimization reports each quarter covering every wireless subscriber.

120.    In its response to WSCA I, SPRINT touted a number of "Account Management and Reporting Tools," including "SmartCD," "WirelessMGR," and "Sprint PCS eBilling and Analysis."

- 30 -

352217.4

SPRINT certified it would comply with the quarterly optimization provision, and represented that "Sprint's Contract Compliance Team will work with WSCA participating States or entities to develop report templates based on their specific requirements." While superficially positive, these statements, too, were false and misleading. SPRINT's "Management and Reporting Tools" were unable to prepare the required optimization reports. While they provided access to raw data, these tools did not incorporate the software needed to identify the most cost-effective rate plan among all those available. Further, the contracts obligated SPRINT to provide optimization reports each quarter regardless of any additional requests from the government customers. If, in conflict with the requirements of the WSCA I RFP, SPRINT intended not to provide optimization reports unless a customer representative specifically requested one, the RFP required SPRINT to say so explicitly by taking exception to the RFP's optimization term. SPRINT's response that it would comply with the RFP was a misrepresentation.

121.    When it responded to the WSCA II RFP, SPRINT took no exception to the optimization requirement in its Certification of Compliance, which constituted SPRINT's agreement to the provision. In its narrative response, SPRINT said only that "Sprint's reporting team will work with the WSCA Account Team to provide contract information in order for the Account Team to build a quarterly optimization report." SPRINT did not have in place the ability or capacity to provide the required reports. As SPRINT noted elsewhere in its response, it had "thousands of WSCA member accounts" at that time. As with WSCA I, if SPRINT intended not to provide optimization reports unless a customer representative specifically requested one, to make its response not misleading, SPRINT was required to say so. SPRINT misrepresented that it would comply with the RFP.

122.    The Carrier Defendants acted knowingly when they made false and misleading representations in their RFP and RFO responses; they acted knowingly when they falsely agreed to comply with the City's explicit requirement that the Carriers provide routine optimization reports; and they also acted knowingly when they submitted invoices that included sums materially above the "lowest cost available" for lines that had not been optimized. The Carrier Defendants knew and

**CONSOLIDATED COMPLAINT IN INTERVENTION**

1  understood the contracts required them to provide optimization reports for the City every quarter, as

2  they attested when they executed the RFP and RFO responses and the contracts.

3      123.  The Carrier Defendants were awarded the contracts because of the representations

4  they made.  If the City had known that the Carrier Defendants would not comply with the mandatory

5  or material terms of the contracts, the Carrier Defendants would not have been awarded the contracts

6  on the terms set forth therein.

7      124.  The Carrier Defendants' failures were not merely the result of poor or inefficient

8  management of their contractual obligations.  In their responses to the RFPs, the Carrier Defendants

9  committed to providing customer service and compliance teams to ensure the implementation and

10  management of the contracts.

11      125.  VERIZON's response to the CWC RFP identified "Five Account Liaisons" who

12  would "own the account management relationship of assigned Government Accounts"; be "subject

13  matter expert[s] on invoicing and reporting billing and research and resolve all facets of invoicing

14  and reporting products"; "have extensive knowledge of contractual obligations"; and "assess needs

15  and proactively suggest alternative services and solutions."  Together with members of the "Strategic

16  Account team (SAT)," the account liaisons were "part of an organization called the Business Service

17  Center (BSC) located in Rancho Cordova, CA."  Chris Rock was identified as the "Contract

18  Manager for the State of California relationship" for the CWC and in response to the state RFO.

19      126.  VERIZON's response to the WSCA I RFP identified RJ Fenolio, "National Account

20  Manager," who was represented to be "intimately familiar with the terms of the agreement and the

21  unique requirements of WSCA and its Participating Entities"; an unnamed "Government Account

22  Executive" who would be "responsible for sales and customer support to government

23  accounts . . . [and] provide quarterly reviews . . . [during which] Verizon Wireless can identify

24  opportunities to save money and provide valuable recommendations and pertinent account

25  information"; and an unnamed "Associate Director, Government," who would be "[r]esponsible for

26  managing the overall operations and budget."

27      127.  SPRINT's response to the CWC RFP identified Shane Harper as the "Senior

28  Government Account Manager (GAM)" who would "lead . . . the account team for the State of

- 32 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

1  California," and serve as the "point of contact for . . . post-sales account management," and Tracey

2  Strong, described as the "Senior Government Account Specialist," who would "assist the GAM . . .

3  [and] synchronize the daily efforts for the GAM, local sales team and Government Customer Care."

4  In addition, unnamed "Strategic Care Specialists (SCS) [were to be assigned] to each of the State

5  agencies" and given "responsibility for ongoing billing maintenance and customer service . . .

6  [including] participat[ing] in quarterly sales reviews and rate plan analyses[.]"

7       128.    SPRINT's response to the WSCA I RFP stated that SPRINT would assign a "Public

8  Sector Account Manager (PS AM)" as the point of contact for participating States and entities "for

9  contract negotiation[,] pre-sales needs assessment, implementation and post-sales account

10  management."  In addition, SPRINT claimed that a "Strategic Care Specialist" would be

11  "responsible for post-sales support . . . and also participate in quarterly sales reviews and rate plan

12  analyses."

13       129.    In response to the WSCA II RFP, SPRINT identified Gray Sigler as the "Client

14  Executive" responsible for "overall performance requirements, ongoing unresolved issues, [and]

15  overall customer service," as well as "oversee[ing] sales execution, operations and internal/external

16  communications."  In addition, Jamie Karakas, "Program Manager," was to be "responsible for

17  overseeing operational processes of the WSCA Agreement."

18       130.    AT&T's response to WSCA I identified Scott Cannon as the "Contract Manager"

19  whose "main responsibilities" were "contract management—updates, modifications, new PAs, offer

20  development, etc."  The "WSCA Program Manger" was to be Ron Montague, who AT&T described

21  as "well versed in report generation, billing requirements, customer care and issue resolution."  Mr.

22  Montague was to be "accountable for the overall performance requirements" under WSCA I.  AT&T

23  also identified by name thirteen additional contract, compliance, and program managers.

24       131.    AT&T identified Twila Lively as the "Contract Manager" for WSCA II and as the

25  "Program Manager" for the RFO.  She was represented to be "100% dedicated to supporting the

26  contract as a single point of contact . . . [and would] work with Account Management, Service

27  Management, Product Management, Systems Support Management, and AT&T Senior Management

28  to verify that AT&T is meeting WSCA performance requirements, resolving issues, and addressing

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

customer service concerns." AT&T further identified the following additional "key personnel/staff to be responsible for performance": Ronald Saenz, "Director—Contracts and Compliance"; Jon Wellinger, "Area Sales VP Technical Overlay"; Ron Montague, "Senior Manager Program Management and Contract Compliance"; Marcellus Brooks, "Contract Manager"; "Compliance Managers" Mark Barros, Matt Phillips, Michael Swenson, and Kelly Yarborough; "Contract Managers" Christine Donabedian, Ann Gillio, and Theresa Page; Mark Flister, "Program Manager"; Brenda Ritchson, "Operations Manager"; and "Reporting Performance Managers" Denise Cuffie and Lori Oliver. Xavier D. Williams, "Senior Vice-President Public Sector & Healthcare," submitted the response on behalf of AT&T to WSCA II and executed the Certification of Compliance representing that AT&T would comply with the RFP.

132. As described above, the Carrier Defendants deliberately responded to the RFPs and RFO in a false and misleading way. They had reason to know the contracts' requirements, and if they did not, they had an obligation to inquire as to these requirements.

133. Carrier Defendants knew and understood, and so attested, that to the extent the narrative portion of their responses to the RFPs conflicted with the terms of the RFPs, those conflicting statements had no effect.

134. Carrier Defendants also knew from experience with their large commercial customers what optimization reports are. All Carrier Defendants regularly entered into contracts with enterprise customers that required rate plan optimization. With these private customers, the Carrier Defendants regularly fulfilled their contractual obligations by providing optimization reports, typically by contracting with an outside vendor. The Carrier Defendants' actions with these corporate clients demonstrate their knowledge of rate plan optimization, its definition, and its industry usage.

135. The Carrier Defendants deliberately violated, deliberately ignored, and/or negligently and recklessly disregarded their material obligations to provide optimization reports each quarter and to bill the City at the lowest cost available. Because the Carrier Defendants were awarded the contracts based on their false and misleading representations, each and every invoice they submitted to the City was false. And, after receiving the City's lucrative business, the Carrier Defendants

- 34 -

352217.4

1    knew they were in breach of the contracts' material requirements, but continued to bill the City for

2    services without reduction. Because these bills charged for amounts in excess of the lowest cost

3    available, the invoices were false.

### The Carrier Defendants Overcharged the City
### Millions of Dollars

136. Because they failed to provide rate plan optimization, the Carrier Defendants

regularly submitted invoices for payment to the City under one or more of the contracts described

above at costs that were substantially above the "lowest cost available." The City, in turn, paid these

invoices.

137. Both the CWC and the Participating Addenda for the WSCA contracts provided that

invoices were to be available in different forms, based on an individual customer's request. At a

minimum, the Carrier Defendants were obligated to and did provide monthly billings in either

electronic or hard copy form to the City.

138. Invoices submitted by the Carrier Defendants to the City can be readily identified by

the Defendants, and are in their possession, custody, and control. Each individual invoice was large

and detailed, and there are thousands of invoices to different departments from different Carriers

throughout the relevant time period.

139. The "lowest cost available" for wireless services requires the Carrier Defendants to

provide rate plan recommendations for each line of service so the City's departments could be

assigned to the optimal rate plan given each line's usage pattern. Because the Carrier Defendants

did not provide rate plan optimization reports, or otherwise optimize the City's lines, the City was

overcharged by 20-30% or more.

140. These lost savings are material to the City. In addition to the magnitude of the lost

savings, the importance of rate plan optimization to the City is demonstrated by the City's efforts to

compel the Carrier Defendants to provide rate plan optimization through its individual contracts with

the Carriers. The City hired a firm in or about 2011, Communications Brokers and Consultants, Inc.

("CBC") to perform rate plan optimization. If rate plan optimization were not material to the City,

the City would not have entered in to this contract with CBC.

- 35 -
**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

141.   The City was damaged as a foreseeable result of the Carrier Defendants' conduct. The City suffered damages that are the difference between the amounts the City paid on the Carrier Defendants' invoices and the amounts that would have been due had the City been able to use rate plan optimization reports to select the lowest cost rate plans available.

## FIRST CLAIM FOR RELIEF

### Violation of the California False Claims Act
### California Government Code § 12651(a)(1)

142.   The allegations contained in paragraphs 1 through 141 are incorporated in full as if set forth herein.

143.   This is a claim for treble damages and forfeitures under the False Claims Act, Cal. Gov't Code §§ 12650 et seq.

144.   Through the acts described above, the Defendants, their agents, and employees, knowingly presented and caused to be presented materially false and fraudulent claims to the City, and knowingly failed to disclose material facts, in order to obtain payment and approval from the City.

145.   The City, unaware of the falsity of the claims made and submitted by the Defendants, their agents, and employees, and as a result thereof, paid money that it otherwise would not have paid.

146.   By reason of the payments made by the City as a result of the Defendants' fraud, the City suffered millions in damages and continues to be damaged.

Wherefore, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF

### Making False Records and Statements in Violation of the California False Claims Act
### California Government Code § 12651(a)(2)

147.   The allegations contained in paragraphs 1 through 146 are incorporated in full as if set forth herein.

148.   This is a claim for treble damages and forfeitures under the False Claims Act, Cal. Gov't Code §§ 12650 et seq.

- 36 -

**CONSOLIDATED COMPLAINT IN INTERVENTION**

352217.4

149.     Through the acts described above, the Defendants, their agents, and employees, knowingly made, used, and caused to be made and used materially false records and statements, which also omitted material facts, in order to induce the City to approve and pay false and fraudulent claims.

150.     The City, unaware of the falsity of the records, statements, and claims made and submitted by the Defendants, their agents, and employees, and as a result thereof, paid money that it otherwise would not have paid.

151.     By reason of the payments made by the City as a result of the Defendants' fraud, the City has suffered millions in damages and continues to be damaged.

Wherefore, Plaintiff prays for relief as set forth below.

**THIRD CLAIM FOR RELIEF**

**Unfair Business Practices**
**California Business & Professions Code §§ 17200 et seq.**

152.     The allegations contained in paragraphs 1 through 151 are incorporated in full as if set forth herein.

153.     At all relevant times, Defendants were engaged in "business practices" as that phrase is defined in the California Unfair Business Practices Act, Cal. Bus. & Prof. Code §§ 17200 et seq.

154.     Defendants' business practices constitute unfair competition within the meaning of Business and Professions Code § 17200, being unlawful, unfair, and/or fraudulent within the meaning of the statute in that, among other reasons, Defendants have failed to optimize the City's rate plans, enabling Defendants to receive substantial overpayments under their contracts.

155.     As a direct and proximate result of their unlawful, unfair, and/or fraudulent business practices, Defendants have acquired and will continue to acquire substantial revenues from the City in the form of overpayments.  The City is entitled to disgorgement and restitution of Defendants' ill-gotten gains pursuant to Business and Professions Code § 17203.

156.     The City is further entitled, pursuant to Business and Professions Code §§ 17200 et seq., to an injunction enjoining Defendants from continuing their illegal practices.

Wherefore, Plaintiff prays for relief as set forth below.

- 37 -

352217.4

## FOURTH CLAIM FOR RELIEF

### Breach of Written Contract

157. The allegations contained in paragraphs 1 through 156 are incorporated in full as if set forth herein.

158. The City entered into agreements with Carrier Defendants whereby the Carrier Defendants sold, and the City purchased, wireless services.

159. Under the terms of these agreements, the Carrier Defendants were obligated to provide wireless optimization reports and service at the lowest cost available to the City.

160. As set forth above, the Carrier Defendants did not provide wireless optimization reports and service at the lowest cost available to the City. Accordingly, the Carrier Defendants, and each of them, breached their obligations under the agreements.

161. The Carrier Defendants' breach of their obligations under the agreements has proximately caused reasonably foreseeable damages to the City.

162. As a result of the Carrier Defendants' wrongful conduct, the City has suffered damages, and continues to be damaged, in an amount to be determined at trial.

Wherefore, Plaintiff prays for relief as set forth below.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

163. The allegations contained in paragraphs 1 through 162 are incorporated in full as if set forth herein.

164. The City conferred a benefit on Carrier Defendants by paying them for wireless services.

165. Carrier Defendants accepted and have retained that benefit in circumstances that render it inequitable for them to retain that benefit.

166. As a result, Carrier Defendants have been unjustly enriched and the City is entitled to the return of the monies it paid to Carrier Defendants.

Wherefore, Plaintiff prays for relief as set forth below.

CONSOLIDATED COMPLAINT IN INTERVENTION

352217.4

## PRAYER FOR RELIEF

Plaintiff the City of Los Angeles prays for judgment against the Defendants, and each of them, as follows:

1.     For damages in an amount equal to three times the amount of damages the City sustained as a result of the Defendants' unlawful conduct;

2.     For damages in an amount equal to all damages proximately caused by Defendants' conduct in an amount to be proven at trial;

3.     For judgment in the amount that Defendants were unjustly enriched, in an amount to be proven at trial;

4.     For civil monetary penalties for each false and fraudulent claim submitted to the City;

5.     For an order directing Defendants to make full restitution;

6.     For a permanent injunction enjoining the Defendants from violating the False Claims Act and the Unfair Business Practices Act;

7.     For attorneys' fees and costs; and

8.     For such other further relief as the Court may deem just and proper.

Dated: September 9, 2016                    CONSTANTINE CANNON LLP


                                            By: _____
                                                Eric R. Havian
                                                CONSTANTINE CANNON LLP
                                                Attorney for Plaintiff City of Los Angeles

CONSOLIDATED COMPLAINT IN INTERVENTION

## PROOF OF SERVICE

I, Janice A. LeBon, declare that I am over the age of eighteen (18) and not a party to the action. I am employed at the law firm of Constantine Cannon, and my office is located at 4 Embarcadero Center, 14th Floor, San Francisco, CA 94111.

On September 9, 2016, I served the following:

**SUMMONS;**

**CONSOLIDATED COMPLAINT IN INTERVENTION OF THE CITY OF LOS ANGELES;**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) PACKAGE**

on the following:

| | |
|---|---|
| The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 | Designated Agent for Service of Process on behalf of Defendant Cellco Partnership d/b/a Verizon Wireless |
| Colin H. Murray (State Bar No. 159142)<br>Brian K. Tomkiel (State Bar No. 267253)<br>BAKER & McKENZIE LLP<br>Two Embarcadero Center, 11th Floor<br>San Francisco, CA 94111-3802<br>Phone: (415) 576-3000<br>Facsimile: (415) 576-3099<br>colin.murray@bakermckenzie.com<br>brian.tomkiel@bakermckenzie.com | Designated Agent for Service of Process on behalf of Defendant Nextel of California, Inc., d/b/a Sprint Nextel and Nextel Communications |
| Colin H. Murray (State Bar No. 159142)<br>Brian K. Tomkiel (State Bar No. 267253)<br>BAKER & McKENZIE LLP<br>Two Embarcadero Center, 11th Floor<br>San Francisco, CA 94111-3802<br>Phone: (415) 576-3000<br>Facsimile: (415) 576-3099<br>colin.murray@bakermckenzie.com<br>brian.tomkiel@bakermckenzie.com | Designated Agent for Service of Process on behalf of Defendant Sprint Solutions, Inc. |
| John C. Richter<br>King & Spalding LLP<br>700 Pennsylvania Ave. NW<br>Washington, DC 20006<br>Phone: (202) 737-0500<br>Facsimile: (202) 626-3737<br>Email: jrichter@kslaw.com | Designated Agent for Service of Process on behalf of New Cingular Wireless National Accounts, LLC, d/b/a Cingular Wireless n/k/a AT&T Mobility National Accounts LLC |

353864 1

1     by first class certified mail by placing a true and correct copy thereof in a sealed envelope

2   with postage thereon fully prepaid and with return receipt requested in the designated area for

3   outgoing U.S. mail in accordance with this office's practice, with which I am familiar.

4     I declare under penalty of perjury that the foregoing document is true and correct.

5   Executed at San Francisco, State of California, this 9th day of September, 2016.

6

7   By: _____

8                    Janice A. LeBon

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**PROOF OF SERVICE**

353864.1



## Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Program Information Package



| The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint.  (CRC 3.221(c)) |
| --- |

## WHAT IS ADR?
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial.  There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences.  In ADR, trained, impartial people decide disputes or help parties decide disputes themselves.  They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?
"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:
- **ADR can save time.**  A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.**  The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.**  For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?
Litigants may elect to participate in ADR at any point in a case.  General civil cases may voluntarily enter into the court's ADR programs by any of the following means:
- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet)
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA  94102
415-551-3869

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) JUDICIAL MEDIATION** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at anytime throughout the litigation process.

**Operation:** Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge for the Judicial Mediation program.

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.